877 F.2d 1508
 HIRAM WALKER & SONS, INC., Plaintiff-Appellee,
v.
KIRK LINE, et al., Defendants,
Indian River Transport, Inc., Defendant-Appellant.
HIRAM WALKER & SONS, INC., Plaintiff-Appellee,
v.
KIRK LINE, et al., Defendants,
Eller & Company, Inc., Defendant-Appellant,
Indian River Transport, Inc., Defendant-Appellee.
HIRAM WALKER & SONS, INC., Plaintiff-Appellee,
v.
KIRK LINE, R.B. Kirkconnell & Bro. Ltd., et al., Defendants,
Indian River Transport, Inc., Defendant-Appellant.
HIRAM WALKER & SONS, INC., Plaintiff-Appellee, Cross-Appellant,
v.
KIRK LINE, R.B. Kirkconnell & Bro., Ltd., Jamaica Merchant
Marine Atlantic Line Ltd., Indian River Transport,
Inc., SS MORANT BAY, its engines,
boilers, etc., Defendants,
Eller & Company, Inc., Indian River Transport, Inc.,
Defendants-Appellants, Cross-Appellees.
 Nos. 87-5048, 87-5094, 87-5111 and 88-5180.
 United States Court of Appeals,
Eleventh Circuit.
 July 21, 1989.
 
 Mark A. Leibowitz, Jay M. Levy, Hershoff & Levy, John D. Kehoe, David F. McIntosh, Corfett, Killian, Hardeman, McIntosh & Levi, Miami, Fla., for Indian River Transport, Inc.
 John P. D'Ambrosio, Elmsfore, N.Y., for Hiram Walker & Sons, Inc.
 Christian D. Keedy, Smathers & Thompson, Kelley, Drye & Warren, Craig Drake Olmstead, Miami, Fla., for Eller & Co., Inc.
 Appeals from the United States District Court for the Southern District of Florida.
 Before KRAVITCH and HATCHETT, Circuit Judges, and MARKEY*, Chief Circuit Judge.
 KRAVITCH, Circuit Judge:
 
 
 1
 The plaintiff Hiram Walker & Sons, Inc.[1] (Hiram Walker), filed this action in the Southern District of New York against defendants Indian River Transport, Inc. (Indian River), Eller & Company, Inc. (Eller), R.B. Kirkconnell & Bro., Ltd. (Kirk Line), and Jamaica Merchant Marine Atlantic Line, Ltd. (Jamaica Line), seeking damages for the loss of several thousand gallons of the liqueur Tia Maria. Upon Eller's motion, the case was subsequently transferred to the Southern District of Florida. After all parties moved for summary judgment, the district court dismissed Kirk Line and Jamaica Line from the action, and granted Hiram Walker's motion against Eller and Indian River on the question of liability. Indian River and Eller each filed an interlocutory appeal in this court, but because of a jurisdictional problem those appeals were never decided on the merits. The district court subsequently held a bench trial to determine the amount of damages due Hiram Walker. Following the trial, the district court quantified Hiram Walker's damages, for which it adjudged Eller and Indian River each fifty percent liable. Eller and Indian River appealed; Hiram Walker cross-appealed against those two defendants but did not appeal the district court's dismissal of the actions against Kirk Line and Jamaica Line. We consolidated all appeals from the earlier summary-judgment order and the order following trial; we now reverse and remand.
 
 I. BACKGROUND
 
 2
 Hiram Walker purchased five thousand gallons of Tia Maria from Estate Industries in Jamaica on March 15, 1985. On March 26, a twenty-three ton tank containing the liqueur was loaded aboard the M/V Morant Bay in Kingston, apparently in good order. Kirk Line had chartered the Morant Bay from its proprietor, Jamaica Line, for a shipment of cargo including Hiram Walker's liqueur, which was shipped under a Kirk Line-Hiram Walker bill of lading. The tank arrived in Miami three days later. Kirk Line hired Eller, a stevedore, to unload the tank from the Morant Bay and store it at the dock.
 
 
 3
 Hiram Walker contracted with Indian River to transport the liqueur overland to New Jersey; Hiram Walker and Indian River agreed that Indian River was to pump the liqueur from the tank into its freight trailer. On April 1, Jones, an employee of Indian River, arrived at the port to effect the pumping transfer. An Eller employee removed the tank from storage and aligned it with the trailer. Jones attempted to connect the tank and the trailer, but realized that a fitting needed to connect the hoses was missing. Even though another fitting on the back of the tank might have been used to pump the liqueur into the trailer, Jones decided that pumping the liqueur would be impossible; therefore, he asked Marshall, an Eller employee, to help him accomplish a "gravity feed"--essentially, Jones wanted to pour the liqueur from the tank to the trailer. To effect a gravity feed, the tank had to be elevated higher than the trailer. Marshall directed another Eller employee, Wright, to assist Jones. Wright lifted the tank on a large forklift; Wright, however, was not licensed to operate forklifts of this capacity.
 
 
 4
 Wright and Marshall neglected to put straw mats or other dunnage between the metal forks and the metal container. Fifteen minutes into the operation, the tank apparently began to slide off the forks because of the lack of dunnage. Deciding that the tank was not properly balanced, Marshall instructed Wright to find another forklift. Wright did not lower the tank, but left the forklift holding the tank suspended eight feet off the ground for ten minutes; leaving a load suspended was a violation of standard company procedure. As Wright returned, the tank fell off the forklift. The tank ruptured, and eighty-five percent of the Tia Maria in the tank spilled out. The liqueur remaining in the tank was contaminated during the clean-up, in which several fire-engine companies covered the area with anti-explosive foam.
 
 II. BASIS OF FEDERAL JURISDICTION
 
 5
 The claim against Indian River was pleaded as a federal question; and against Eller, in diversity. The district court analyzed the cases against Eller and Indian River under maritime tort law; because the accident in question did not occur at a maritime situs, however, admiralty jurisdiction would not support the claims against these two defendants. Harville v. Johns-Manville Products Corp., 731 F.2d 775, 782 (11th Cir.1984); Boudloche v. Conoco Oil Corp., 615 F.2d 687, 688 (5th Cir.1980).[2] On appeal, Indian River argues that the district court lacked subject-matter jurisdiction over the claim asserted against it. We of course may consider the question of Article III subject-matter jurisdiction for the first time on appeal; additionally, an explanation of the basis of federal jurisdiction over each defendant will point out the source of law applicable to each claim.
 
 A. Federal subject-matter jurisdiction
 
 6
 Hiram Walker urges that its claim against Indian River arises under the Carmack Amendment, 49 U.S.C. Sec. 11707, which provides in relevant part:
 
 
 7
 A common carrier providing transportation or service subject to the jurisdiction of the Interstate Commerce Commission ... shall issue a receipt or bill of lading for property it receives for transportation under this subtitle. That carrier ... [is] liable to the person entitled to recover under the receipt or bill of lading. The liability imposed under this paragraph is for the actual loss or injury to the property caused by (1) the receiving carrier.... Failure to issue a receipt or bill of lading does not affect the liability of a carrier....
 
 
 8
 49 U.S.C.A. Sec. 11707(a)(1) (1988). In its complaint, Hiram Walker alleged that Indian River "totally breached, failed and violated its duties as an interstate common carrier in receiving, tending, caring for and delivering the [shipment of Tia Maria] in good condition, but on the contrary, so seriously [damaged] the same while in its possession that it was rendered a total loss." Section 1337 of Title 28 imposes an amount-in-controversy requirement over suits brought under the Carmack Amendment; that requirement is satisfied by the allegations in the complaint. The complaint sufficiently pleaded a federal claim against Indian River.[3]
 
 
 9
 Because the Carmack Amendment would not support the claim against Eller, Hiram Walker alleged that this claim was properly within the court's diversity jurisdiction. 28 U.S.C. Sec. 1332. In the complaint, Hiram Walker conspicuously failed to allege that it and Indian River were of diverse citizenship. Diversity jurisdiction ordinarily is not available "when any plaintiff is a citizen of the same State as any defendant." Owen Equipment & Erection Co. v. Kroger, 437 U.S. 365, 374, 98 S.Ct. 2396, 2403, 57 L.Ed.2d 274 (1978). An exception to the general rule exists, however, when the plaintiff joins a non-diverse defendant sued under federal law with a diverse defendant sued in diversity. Romero v. Int'l Terminal Operating Co., 358 U.S. 354, 381, 79 S.Ct. 468, 485, 3 L.Ed.2d 368 (1959) ("Since the Jones Act provides an independent basis of federal jurisdiction over the non-diverse respondent, ... the rule of Strawbridge v. Curtiss, 3 Cranch 267, 2 L.Ed. 435, does not require dismissal of the claims against the diverse respondents."); Kauth v. Hartford Ins. Co., 852 F.2d 951, 958-59 (7th Cir.1988); Baker v. J.C. Penney Co., 496 F.Supp. 922 (N.D.Ga.1980). In Baker, Judge Vining observed that an anomaly would be created by "not allowing a plaintiff to do in one federal suit what he would be entitled to do in two separate federal suits." 496 F.Supp. at 924.
 
 
 10
 Alternatively, the claim against Eller was properly within the pendent-party jurisdiction of the district court. We recently held that district courts have
 
 
 11
 the power to hear the state claim against the second party if (1) the federal claim against the first party is substantial, meaning not "inescapably" frivolous, Jackson v. Stinchcomb, 635 F.2d 462, 471 (5th Cir.1981), (2) the statute conferring jurisdiction over the federal claim does not "expressly or by implication negate[ ]" the existence of pendent jurisdiction, Aldinger v. Howard, 427 U.S. 1, 18, 96 S.Ct. 2413, 2422, 49 L.Ed.2d 276 (1976), and (3) the state claim arises out of a "common nucleus of operative fact," such that the plaintiff would be expected to try the federal and state claims together. [United Mine Workers v. Gibbs, 383 U.S. 715, 725, 86 S.Ct. 1130, 1138, 16 L.Ed.2d 218 (1966) ].
 
 
 12
 Giardiello v. Balboa Ins. Co., 837 F.2d 1566, 1570 (11th Cir.1988) (emphasis in original). Here, the federal claim is substantial and the claims against Eller and Indian River, as joint tortfeasors, arise out of a "common nucleus of operative fact." With regard to the second prong, even though claims under the Carmack Amendment may be brought in state court, 49 U.S.C. 11707(d)(1), Congress has neither expressly nor impliedly foreclosed the possibility of pendent-party jurisdiction under the Carmack Amendment. Boudreaux v. Puckett, 611 F.2d 1028, 1031 (5th Cir.1980) (no negation of pendent-party jurisdiction under 15 U.S.C. Sec. 1981 even though such claims may be brought in state court); compare Aldinger, 427 U.S. at 19, 96 S.Ct. at 2422 (Congress impliedly negated pendent-party jurisdiction over counties in suits predicated on 28 U.S.C. Sec. 1343(3), which provides jurisdiction for suits brought under 42 U.S.C. Sec. 1983, because counties were not "persons" covered by Sec. 1983 under the then-extant construction) with Giardiello, 837 F.2d at 1571 (no negation of pendent-party jurisdiction under ERISA); First Alabama Bank v. Parsons Steel, Inc., 747 F.2d 1367, 1377 (11th Cir.1984) (no negation of pendent-party jurisdiction under Bank Holding Company Act), rev'd on other grounds, 474 U.S. 518, 106 S.Ct. 768, 88 L.Ed.2d 877 (1986); and Lykins v. Pointer Inc., 725 F.2d 645, 647 (11th Cir.1984) (no negation of pendent-party jurisdiction under 28 U.S.C. Sec. 1346(b)).
 
 B. Source of the rule of law
 
 13
 For Indian River, federal law governs the determination of liability and the measure of damages under the Carmack Amendment, and common-law principles give content to the federal rule. Hector Martinez & Co. v. Southern Pacific Transportation Co., 606 F.2d 106, 108 n. 1 (5th Cir.1979), cert. denied, 446 U.S. 982, 100 S.Ct. 2962, 64 L.Ed.2d 838 (1980); Dublin Co. v. Ryder Truck Lines, Inc., 417 F.2d 777, 778 (5th Cir.1969).
 
 
 14
 Analysis of the source of law for the claim against Eller is a bit more complicated. This action originally was filed in the Southern District of New York, and Eller moved that court, pursuant to 28 U.S.C. Sec. 1404(a), to transfer the case to the Southern District of Florida. The Florida federal court, therefore, must apply the rule that would have been applied by the transferor New York federal court. Van Dusen v. Barrack, 376 U.S. 612, 639, 84 S.Ct. 805, 821, 11 L.Ed.2d 945 (1964). The New York federal court would have applied the New York choice-of-law rule in determining whether to apply Florida tort law or New York tort law to this claim. Klaxon Co. v. Stentor Electric Manufacturing Co., 313 U.S. 487, 496, 61 S.Ct. 1020, 1021, 85 L.Ed. 1477 (1941).
 
 
 15
 Over twenty-five years ago the New York Court of Appeals abandoned the strict lex loci delicti rule in favor of interest analysis for choice-of-law in torts cases. Babcock v. Jackson, 12 N.Y.2d 473, 191 N.E.2d 279, 240 N.Y.S.2d 743 (1963). Interest analysis would in any event lead a New York court to apply Florida law in judging Eller's conduct, even were Florida law inconsistent with the law in New York. See Schultz v. Boy Scouts of America, Inc., 65 N.Y.2d 189, 480 N.E.2d 679, 491 N.Y.S.2d 90 (1985) ("when the conflicting rules involve the appropriate standards of conduct, rules of the road, for example, the law of the place of the tort 'will usually have a predominant, if not exclusive concern' "); Hacohen v. Bolliger Ltd., 108 A.D.2d 357, 489 N.Y.S.2d 75 (1985) (where defendant's standard of conduct is judged, court should look to the place of the tort in order to give effect to that jurisdiction's interest in regulating conduct within its borders). Eller's conduct is therefore to be measured under Florida law.
 
 III. LIABILITY OF INDIAN RIVER AND ELLER
 A. Indian River
 
 16
 We review the disposition of a motion for summary judgment de novo, applying the same standards that should have been applied by the district court. Eastern Air Lines v. Air Line Pilots Assoc. Int'l, 861 F.2d 1546, 1549 (11th Cir.1988). The district court drew the following inferences from the papers the parties submitted in support of their cross-motions for summary judgment:
 
 
 17
 A gravity feed, unlike a pumping transfer, required that the tank containing the liqueur be elevated to a height sufficient to allow sheer gravitational force to impel the liqueur in the tank to drain downward to the [Indian River] trailer. This operation, of course, was intrinsically and conspicuously fraught with dangers which would not have been present in a pumping transfer. It therefore seems plain that had Jones brought a cam-lock, the instrumentality needed to perform the transfer of the liqueur properly, the accident resulting in [Hiram Walker's] tank of liqueur being dropped and spilled, would never have occurred.
 
 
 18
 On the basis of these observations, the district court adjudged Indian River liable for the damage to the Tia Maria. The trial court disregarded contradictory evidence and plainly drew inferences against Indian River, the non-movant. In the procedural posture of this case, the district court's exercise of its fact-finding powers constituted reversible error.[4]
 
 
 19
 The claim against Indian River appears to based on both a theory of tort and a theory of contract: Indian River behaved negligently in failing to bring the required fitting and then requesting a gravity transfer; alternatively, Indian River breached an express term of its contract with Hiram Walker by failing to perform a pump transfer. At least two questions are presented under a theory of tort that were not susceptible of resolution against Indian River on a motion for summary judgment. First, drawing inferences in favor of the non-movant, the district court should have concluded that it was "highly extraordinary" that Indian River's failure to bring the proper fitting "should have brought about the harm." Restatement (Second) of Torts Sec. 435(2). The court may yet draw that conclusion after a full airing of the facts at trial, a conclusion that would absolve Indian River of liability for the lost liqueur.
 
 
 20
 Second, Indian River has demonstrated a very substantial question whether Eller's behavior should be considered a superseding cause of the accident, another finding that would preclude Indian River's liability. Restatement (Second) of Torts Secs. 440-453. It is beyond dispute that Eller's conduct "actively operate[d] in producing harm to [Hiram Walker] after [Indian River's] negligent act or omission ha[d] been committed." Restatement (Second) of Torts Sec. 441(1). Eller's conduct was thus an "intervening force" causing the spill; again drawing all inferences in favor of Indian River, the court should have determined that the intervening force was a superseding cause. Among other considerations, Eller's negligence brought about "harm different in kind from that which would otherwise have resulted from [Indian River's] negligence;" Eller's negligence was not "a normal result" of Indian River's negligence; the intervening force was due to Eller's action; and "the intervening force [was] due to an act of [Eller] which [was] wrongful toward [Hiram Walker] and as such subject[ed] [Eller] to liability."[5] See Restatement (Second) of Torts Sec. 442. Evidence before the district court established the foregoing for summary judgment purposes; the court had before it proof that gravity transfers are common and usual, and that Eller had previously performed gravity feeds for Indian River's drivers who had arrived without the proper pumping equipment.[6]
 
 
 21
 As a matter of law, Indian River's conduct in ordering a gravity feed cannot be characterized as negligent on the basis of the facts before the district court. The district court had before it no evidence tending to show that gravity feeds are inherently and unreasonably dangerous; to the contrary, the court was presented with evidence that dockworkers often perform gravity feeds.[7] It may be that gravity feeds are more difficult than pump transfers, but that alone would not render one who requests a gravity feed liable for any damage that arises from a botched execution. We are presented with no substantial evidence that a competently executed gravity feed is an unreasonable solution to the problem of transferring a liquid from one tank to another; indeed, a gravity feed may under some circumstances be more efficient than pumping transfers. We cannot write a rule of law which would prevent prudent persons from requesting gravity feeds.[8]
 
 
 22
 Nor was summary judgment against Indian River proper under a theory of contract. Assuming Indian River did breach its contract with Hiram Walker, it would be liable only for those damages which it had "reason to foresee as a probable result of the breach when the contract was made." Restatement (Second) of Contracts Sec. 351(1); see Hadley v. Baxendale, 9 Ex. 341, 156 Eng.Rep. 145 (1854). We certainly cannot say as a matter of law that Indian River had "reason to foresee" that its failure to perform a pump transfer and its request that Eller undertake a gravity feed would result in the loss of nearly all of the Tia Maria. Whether framed as a tort or a breach of contract, summary judgment should not have been entered against Indian River on the question of liability.
 
 B. Eller
 
 23
 We agree that the undisputed facts surrounding the loss of the Tia Maria established Eller's negligence as a matter of Florida law. See Russ v. State, 140 Fla. 217, 191 So. 296 (1939); Seaboard Coast Line R.R. Co. v. Griffis, 381 So.2d 1063, 1065 (Fla.App.) ("Negligence is the failure to observe, for the protection of another's interest, such care and precaution as the circumstances demand, or the failure to do what a reasonable and prudent person would ordinarily have done under the circumstances."), cert. denied, 376 So.2d 72 (Fla.1979); Stirling v. Sapp, 229 So.2d 850, 853 (Fla.1969) ("Where the facts are undisputed and the evidence is reasonably susceptible of but a single inference, the question of defendant's negligence ... becomes one of law for the court."). An Eller employee not licensed to operate the particular forklift raised the twenty-three ton tank containing Tia Maria without placing dunnage between the tank and the blades of the forklift. When his supervisor noticed that the tank was slipping, the employee left the tank suspended above the ground for several minutes while searching for another forklift. The tank fell and ruptured; the Tia Maria was lost to the happy wharf rats. Hiram Walker satisfied its burden of producing enough undisputed evidence to make out a prima facie case for negligence under the Russ standard. The burden shifted to Eller to show that, notwithstanding these facts, its employees' behavior was reasonable under the circumstances. Eller argues that the trial court incorrectly presumed that the Eller forklift operator should have complied with standard operating procedures and "lowered the tank when the tilt was first noticed to save the day." Eller, who had the burden of showing that this direct inference from the undisputed facts was at least questionable, points to no proffer that calls the inference into doubt. Even assuming that the tank could not have been lowered, Eller does not proffer evidence suggesting why it should not be held negligent for allowing an unlicensed forklift operator to lift the tank without proper dunnage. Accordingly, Eller has raised only a "metaphysical doubt" as to the material facts and its claim must fail. Matsushita Electric Industrial Co. v. Zenith Radio Corp., 475 U.S. 574, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986) (when moving party has satisfied its burden, non-movant must come forward with "specific facts showing that there is a genuine issue for trial " (quoting Fed.R.Civ.P. 56(c)) (emphasis in original)).
 
 
 24
 Hiram Walker and Eller also join issue on the effect of a "Himalaya"[9] clause in Kirk Line's bill of lading, which provides that the "limitation of liability [in the Carriage of Goods by Sea Act (COGSA) ] shall inure ... to the benefit of any independent contractors performing services hereunder including stevedoring in connection with the goods covered hereunder." COGSA limits liability to $500 for damage to the tank, a "customary freight unit." E.g., Caterpillar Americas Co. v. S.S. Sea Roads, 231 F.Supp. 647 (S.D.Fla.1964), aff'd, 364 F.2d 829 (5th Cir.1966). Kirk Line hired Eller, a stevedore, to complete its delivery obligation; Eller was an independent contractor. On summary judgment, however, the trial court concluded as a matter of law that "Eller was a volunteer and acted only when [Indian River] failed to provide the necessary equipment for the pumping operation." Accordingly, the court found that Eller was not acting within the scope of its stevedoring responsibilities to Kirk Line, and was not entitled to the limitation-of-liability provision of COGSA. We review this determination de novo, applying the law of COGSA which the parties to the bill of lading made applicable beyond the Act's legal scope. Assicurazioni Generali v. D'Amico, 766 F.2d 485, 488 (11th Cir.1985); Triple E Development Co. v. Floridagold Citrus Corp., 51 So.2d 435, 438 (Fla.1951) (intent of parties governs construction of contract).
 
 
 25
 Although Himalaya clauses must be "strictly construed and limited to intended beneficiaries," Robert C. Herd & Co. v. Krawill Machinery Corp., 359 U.S. 297, 305, 79 S.Ct. 766, 771, 3 L.Ed.2d 820 (1959); Certain Underwriters at Lloyds v. Barber Blue Sea Line, 675 F.2d 266, 269 (11th Cir.1982), "[w]hen a bill of lading refers to a class of persons such as 'agents' or 'independent contractors' it is clear that the contract includes all those persons engaged by the carrier within the scope of the carriage contract." Id. at 270. Kirk Line was responsible under the bill of lading for delivering the Tia Maria to Hiram Walker's agent Indian River; Eller would be an intended beneficiary of the Himalaya clause as long as Kirk Line had not completely discharged its responsibility by the time of the spill. Assicurazioni Generali, 766 F.2d at 489. The question thus presented is whether Kirk Line's duty was fulfilled when Eller aligned the tank with Indian River's truck; if so, Kirk Line had completed its responsibilities under the bill of lading before the spill occurred, and Eller could not be said to have been an "independent contractor performing services" under the bill of lading at the time of the accident. If, however, because of Indian River's failure to secure the proper fitting, delivery was not completed by the mere alignment of the tank with the trailer, then Kirk Line's duty of delivery would have continued and Eller would have been "an independent contractor performing services" under the bill of lading at the time of the spill, entitled to the $500 limitation.[10]
 
 
 26
 Hiram Walker proffered the following evidence on this narrow question. First, it offered the deposition testimony of Eller's director of safety, in which he stated that Eller employees had performed the gravity transfer for the convenience of Indian River and agreed that "doing the gravity transfer bit was over and above the normal expected activities of Eller in transferring products." Second, this witness testified that during a pumping transfer, Eller had the duty to align the tank and the trailer, but Indian River had the duty to effect the transfer. (Another deposition witness, Eller's employee Marshall, confirmed that Indian River bore responsibility for the mechanics of a pump transfer once Eller aligned the tank and the trailer.) Finally, Hiram Walker offered the affidavit of its traffic manager, who stated that "[i]t was HIRAM WALKER's understanding with INDIAN RIVER that it was the latter's sole responsibility to transfer the bulk products from the ocean tanks to its tankers. It was not part of HIRAM WALKER's agreement with KIRK LINE that KIRK LINE would bear that responsibility."
 
 
 27
 Eller for its part proffered the affidavit of its local Miami manager, who stated that Eller's responsibility as an independent contractor for Kirk Line was to "physically move the cargo from ELLER's lot and deliver the cargo to the consignee by transferring physical possession of the cargo to the consignee." Of course, Eller's local manager is probably in a better position than its safety director to know the stevedore's responsibilities.
 
 
 28
 Neither party's proffer demonstrates as a matter of law or undisputed fact at what point discharge of Kirk Line's responsibility under the bill of lading occurred. The affidavit of Hiram Walker's safety manager is the only direct evidence that the agreement between Hiram Walker and Kirk Line did not contemplate Kirk Line having any responsibility for the actual transfer of the Tia Maria, but this evidence has substantial weaknesses: it is a conclusory statement of an interested party and makes no reference to the actual written agreement between Kirk Line and Hiram Walker; further, it may be predicated upon the incorrect assumption that only a pump transfer would occur.
 
 
 29
 Inferences from the statements of Eller's director of safety and its Miami manager lead in opposite directions; a reasonable inference from the statement proffered by Hiram Walker is that Eller--and therefore presumably Kirk Line--had no responsibility for the actual transfer of the liquid cargo whether the transfer was effected by a gravity feed or by pumping. On the other hand, one could reasonably infer from the statement proffered by Eller that the stevedore--and thus presumably Kirk Line--remained responsible under the bill of lading until the last of the liquid cargo was transferred to the care of Hiram Walker's agent Indian River. Moreover, there are good reasons why a consignee such as Indian River may be responsible for a pumping transfer but not a gravity feed: the pump itself is apparently attached to the consignee's trailer, but as gravity feeds require the use of a forklift, a stevedore may have primary responsibility for that kind of operation. When a pumping transfer is effected, delivery may occur when the tank and the trailer are aligned--but it does not necessarily follow that delivery in the case of a gravity feed can finally occur before the last of the liquid is drained into the trailer; the scope of Kirk Line's duty under the bill of lading may thus depend upon the type of transfer that actually is performed. The district court should determine after trial whether Kirk Line's obligations had completely terminated by the time of the spill, but its conclusion on summary judgment was in error.[11]
 
 
 30
 REVERSED and REMANDED.
 
 
 
 *
 Honorable Howard T. Markey, Chief U.S. Circuit Judge for the Federal Circuit, sitting by designation
 
 
 [1]
 Aetna, Hiram Walker's insuror, paid the entire loss and thus Hiram Walker no longer has an interest in the case. Under the normal rules of subrogation, Aetna was the real party in interest and should have sued in its own name. Frank Briscoe Co. v. Georgia Sprinkler Co., 713 F.2d 1500, 1502 n. 1 (11th Cir.1983). The district court stated that Aetna should have filed an appearance, but held that the defect did not warrant dismissal of the claim because counsel for plaintiff advised on the record that he was bringing the claim for the use and benefit of Aetna. This was a bench trial, the fact finder knew that Aetna was the real party in interest, and no defendant has shown any prejudice. The district court did not abuse its discretion by constructively joining Aetna as a party plaintiff and refusing to dismiss the claim
 
 
 [2]
 See Bonner v. City of Prichard, 661 F.2d 1206, 1209 (11th Cir.1981) (in banc). The Eleventh Circuit adopted as binding precedent all decisions rendered by the former Fifth Circuit prior to October 1, 1981
 
 
 [3]
 Venue may have been incorrect in the New York district court. See 49 U.S.C. Sec. 11707(d)(2)(A)(iii). No party raised this objection, however, and the error was probably cured by the subsequent transfer to the Southern District of Florida
 
 
 [4]
 Hiram Walker argues that because this case was to be tried without a jury, we should apply the clearly erroneous test of Rule 52 to the findings made by the district judge on summary judgment. Cf. Nunez v. Superior Oil Co., 572 F.2d 1119, 1123-25 & n. 6 (5th Cir.1978) ("If decision is to be reached by the court, and there are no issues of witness credibility, the court may conclude on the basis of the affidavits, depositions, and stipulations before it, that there are no genuine issues of material fact, even though decision may depend on inferences to be drawn from what has been incontrovertibly proved.") Assuming that the pleadings incontrovertibly proved all material facts such that only inferences remained to be drawn, we would be left with a definite and firm conviction that the district court erred in holding Indian River liable. Moreover, the trial judge may have incorrectly assumed that no facts were in dispute, for the judge noted that "all the parties to this action have moved for summary judgment, thereby clearly indicating their accord that no genuine issue of fact remains to be resolved." This is not a correct statement of the law; a movant may be correct in stating that the facts relevant to his theory of the case are not in dispute, yet contest the relevant issues of fact under his opponent's theory. Walling v. Richmond Screw Anchor Co., 154 F.2d 780, 784 (2d Cir.), cert. denied, 328 U.S. 870, 66 S.Ct. 1383, 90 L.Ed. 1640 (1946). For this reason we think it prudent not to accord a presumption of correctness to the district judge's fact-finding
 
 
 [5]
 It is irrelevant that Hiram Walker may have agreed to waive a substantial portion of Eller's liability; Eller's conduct nonetheless subjected it to liability to Hiram Walker
 
 
 [6]
 Hiram Walker quotes three Restatement (Second) of Torts provisions, arguing that they prove that Indian River's negligence in failing to bring the correct fitting was not superseded by Eller's negligence. None of these sections indicates as a matter of law that Eller's conduct is not a superseding cause:
 (1) Where the negligent conduct of the actor creates or increases the foreseeable risk of harm through the intervention of another force, and is a substantial factor in causing the harm, such intervention is not a superseding cause.
 Restatement (Second) of Torts Sec. 442A. Although failing to bring the proper fitting may have increased the risk that the tank would fall (because that danger inheres in a gravity transfer), Indian River's failure to bring the proper fitting was not indisputably a substantial factor causing the tank to fall.
 (2) Where the negligent conduct of the actor creates or increases the risk of a particular harm and is a substantial factor in causing that harm, the fact that the harm is brought about through the intervention of another force does not relieve the actor of liability....
 Restatement (Second) of Torts Sec. 442B. Again, Indian River's failure to bring the proper fitting was not necessarily a substantial factor causing the tank to fall.
 (3) The intervention of a force which is a normal consequence of a situation created by the actor's negligent conduct is not a superseding cause of harm which such conduct has been a substantial factor in bringing about.
 Restatement (Second) of Torts Sec. 443. Negligent execution of a gravity feed is by no means a "normal consequence" of attempting a gravity feed.
 
 
 [7]
 The colloquy between counsel for Indian River and the safety director for Eller, proffered by Hiram Walker in an attempt to show that gravity feeds are inherently and unreasonably dangerous, merely suggests that gravity feeds are more difficult than pumping transfers
 
 
 [8]
 There is some confusion in the briefs concerning Indian River's liability for Eller's conduct. We do not read the district court's order on summary judgment to impose liability on Indian River under a theory of agency; the court held Indian River liable for its own acts and omissions
 
 
 [9]
 So named after the vessel in an English case. See the exegesis in Brown & Root, Inc. v. M/V Peisander, 648 F.2d 415, 417 n. 5 (5th Cir.1981)
 
 
 [10]
 Indian River argues that delivery had already been completed under clause 12 of the bill of lading, which provides that delivery is complete when goods are taken "into the custody of customs or other authorities." Acknowledging that no record evidence suggests that "customs or other authorities" took possession of the liqueur, Indian River argues that "it is a more than reasonable inference that inspection had occurred within the meaning of the bill of lading prior to" Indian River's arrival. Indian River cannot base its case on a provable fact it never attempted to establish below
 
 
 [11]
 Because we have reversed the district court's determination of liability as to both Indian River and Eller, we need not address the parties' arguments about the quantification of damages and the district court's decision not to award pre-judgment interest. When considering the question of pre-judgment interest on remand, as to the claim against Eller, the district court is free to consider the effect of Argonaut Ins. Co. v. May Plumbing Co., 474 So.2d 212, 215 (Fla.1985) (pre-judgment interest under Florida law--as Florida law supplies the rule for the liability claim against Eller, New York choice-of-law principles mandate that Florida law also supply the rule of decision for Hiram Walker's claim for pre-judgment interest, see Entron, Inc. v. Affiliated FM Ins. Co., 749 F.2d 127, 131 (2d Cir.1984)). As to the pre-judgment interest claim against Indian River, the district court should consider the applicability of the reasoning in George R. Hall, Inc. v. Superior Trucking Co., 532 F.Supp. 985, 996-98 (N.D.Ga.1982) (pre-judgment interest under the Carmack Amendment)